THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. RUBEN VASQUEZ, Defendant-Appellee.

First District (4th Division)    No. 1—07—0148

Opinion filed February 11, 2009.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for appellant.

John R. De Leon & Associates, of Chicago (John R. De Leon and Kelvin D. McCabe, of counsel), for appellee.

JUSTICE NEVILLE delivered the opinion of the court:

The defendant, Ruben Vasquez, was arrested and indicted for money laundering and possession of a controlled substance. Vasquez filed a motion to quash his arrest and suppress evidence. After a hearing, the court granted the defendant's motion. The State filed a certificate of substantial impairment and presents the following issues for our review: (1) whether police officers had a reasonable suspicion of narcotics trafficking that would justify the investigatory stop of the defendant's vehicle; (2) whether the defendant was under arrest and in police custody when his vehicle was stopped and he signed the consent to search form; and (3) whether the defendant's consent to search authorized the police to remove the bumper of his vehicle. For the following reasons, we affirm.

## I. BACKGROUND

### A. The Suppression Hearing

#### 1. The Defendant's Case

Robert Spiegel[1] testified that on April 19, 2005, he was the front desk clerk at the Sleep-In Motel by Midway Airport. Spiegel was an informant for the High Intensity Drug Trafficking Area (HIDTA) police team. The HIDTA team did not give Spiegel a formal profile of persons to watch for, but they suggested that he look for guests with the following characteristics: (1) out-of-state guests from Texas, Arizona, California, and Iowa; (2) guests checking into the hotel without knowing how long they were going to stay or only staying for one night; (3) guests paying in cash; and (4) guests not having much luggage. Spiegel explained that he would receive approximately $300 when he called the HIDTA team and informed them about suspicious activity by a guest.

Spiegel further testified that when a guest checked into the hotel and paid in cash, the hotel clerk would ask for the guest's driver's license. The clerk would then put the guest's information into a hotel computer. Spiegel did not register the defendant at the hotel. However, Spiegel looked through the registrations and learned that the

---

[1]Spiegel testified that following the incident in question, he became an officer with the Chicago police department on October 31, 2005.

defendant was from Texas, paid for his room with cash, and indicated that he was going to stay the night on April 19, 2005, and depart on April 20, 2005. Spiegel called Officer Feliciano and provided him with the defendant's name, address, date of birth, and the type of vehicle the defendant was driving. Spiegel also gave Officer Feliciano a copy of the defendant's driver's license. Spiegel testified that, prior to making the call to Officer Feliciano, he did not see the defendant meet with anyone, pass packages to anyone, or commit any crimes.

On cross-examination Spiegel testified that, before he called Officer Feliciano, he saw the defendant (1) pace in the lobby, (2) walk outside, (3) look around as if looking for someone, (4) look into a silver vehicle (which was later identified as the defendant's vehicle), (5) come back into the hotel, and (6) repeat this activity several times. At one point, the defendant asked Spiegel if there was a pay phone nearby even though Spiegel observed the defendant talking on a cell phone.

On redirect examination, Spiegel testified that it is not uncommon for people to walk up and down the hotel lobby as if waiting for someone. During questioning by the court, Spiegel testified that he received payment for the instant case in November or December of 2005.

Officer Feliciano testified that in April of 2005, he was part of the HIDTA team that went to hotels and retrieved information from hotel clerks. The clerks received a monetary payment that was paid by Cook County when they gave the HIDTA team tips that "worked out." Officer Feliciano explained that the HIDTA team focused on cash-paying customers from specific "source states"; however, being a member of a minority group was not one of the factors the HIDTA team considered. On April 20, 2005, Officer Feliciano received a call from Spiegel, who told him that there was a suspicious man named Ruben Vasquez, Jr., pacing around in the hotel lobby, looking around in all directions, and exiting and returning to the hotel. Spiegel also told Officer Feliciano that the defendant asked for a pay phone even though Spiegel saw him on a cell phone. Spiegel told Officer Feliciano the defendant's name, told him that the defendant was from Texas, and described the defendant's vehicle as a Volkswagen Jetta with a Texas license plate.

Officer Feliciano arrived at the hotel at approximately 8:30 a.m., and Spiegel gave him a copy of the defendant's driver's license. Spiegel also gave Officer Feliciano the driver's licenses of three other people unrelated to the instant case. Officer Feliciano called the El Paso Intelligence Center, which is a main computer connected to all United States government agencies, had them "run" the defendant's name and date of birth, and learned that the defendant had two prior arrests for narcotics.

Officer Feliciano testified that none of the four officers following the defendant saw him commit a crime, including a traffic violation. Rather, the officers pulled the defendant over for an investigatory stop with the intent to search his vehicle. One of the unmarked police vehicles pulled the defendant's car over, and the defendant pulled his car into a Marathon gas station. Officer Feliciano was the first officer to speak with the defendant. Officer Feliciano told the defendant that they were conducting a narcotics investigation and believed that the defendant was participating in narcotics transactions. The officers searched the defendant's vehicle for 10 to 15 minutes in the gas station parking lot, but they did not find any contraband, narcotics, or illegal substances. During the search, the defendant and Officer Feliciano stood approximately three or four feet from the back of the defendant's car. The officers did not have a search warrant for the car or an arrest warrant for the defendant.

Officer Feliciano testified that the officers moved to a second location, 4923 South Kildare, and searched the defendant's vehicle. At the second location, the defendant was sitting in a covert leased police vehicle and was free to leave at any time, although Officer Feliciano did not tell the defendant that he was free to leave at any time. The police found money in the defendant's vehicle during the second search.

On cross-examination, Officer Feliciano testified that the defendant had previously been arrested in 2000 and 2001 for possession of and distribution of marijuana and, at the time of the instant offense, he was on parole. Officer Feliciano informed the HIDTA team that he wanted to conduct surveillance at the hotel.

On April 20, 2005, at approximately 9:30 a.m., Officer Feliciano observed the defendant walk from the hotel lobby, look around, walk through the parking lot, look into parked vehicles, and return to the hotel. The officer observed the defendant follow this routine two more times. The defendant emerged from the hotel with a blue suitcase, walked to his car, placed the suitcase in the trunk, and drove out of the parking lot. The surveillance officers followed him. The defendant made a series of turns and essentially traveled in a circle. Every so often the defendant would pull his vehicle to the side of the road, park his vehicle, and wait a few minutes before pulling back into traffic. Officer Feliciano opined that the defendant was conducting countersurveillance in an attempt to see if anyone was following him. Eventually the defendant turned onto 49th Street, exited the vehicle, placed a call on his cell phone, and began walking. At approximately 10:10 a.m., Officer Feliciano observed the defendant emerge from a house located at 4923 South Kildare, get into his vehicle, and drive away. The defendant

drove to an Auto Zone store, went inside, and exited the store carrying a white plastic bag. At 10:45 a.m., the defendant reappeared at 4923 South Kildare. According to Officer Feliciano, another officer, Officer Keating, observed another male Hispanic standing by the garage door, observed the defendant enter the garage, and observed the garage door close. Approximately 45 minutes later, the defendant emerged from the garage in his vehicle and traveled down the alley. The officers stopped the vehicle in a Marathon gas station parking lot.

Officer Feliciano testified that when he spoke in Spanish with the defendant at the gas station, he was dressed in civilian clothes, his gun was not exposed, the defendant was not handcuffed, and the tone of the conversation was conversational. Officer Feliciano asked the defendant if he would consent to a search of the vehicle, and the defendant hesitated. Officer Feliciano immediately read the defendant his *Miranda* rights in Spanish, and the defendant indicated that he understood his rights. Officer Feliciano had a consent to search form written in Spanish. He explained the form to the defendant, and he told the defendant that he had the right to refuse consent. The defendant said that he was willing to cooperate with the police and signed the form. According to Officer Feliciano, no one searched the vehicle until the written consent was signed, and no one threatened or made any promises to the defendant.

As the officers searched the defendant's vehicle, Officer Feliciano spoke with the defendant and asked him where he had been prior to being stopped. The defendant said that he had come from Texas to visit a sick relative, and he gave the officer an address in the 4900 block of South Kildare. The defendant denied that he had parked his vehicle at a location other than in front of his relative's house. Initially, the defendant told the officer that he stayed with his relatives, but then he told the officer that he stayed at a hotel.

The police did not find any contraband after a cursory search of the vehicle. However, one of the officers noticed tool marks on the vehicle's bumper and noticed that one of the bolts on the bumper was loose. After the officers found the tool marks, Officer Feliciano told the defendant that they needed to conduct a further investigation to determine whom the defendant had gone to see. Therefore, the officers moved the investigation from the gas station parking lot to the 4900 block of Kildare. Once the defendant said that he was willing to cooperate with the police, the officers patted him down and he got into the back of Investigator Liboy's leased vehicle, but he was not handcuffed.

After the defendant left the gas station, the officers called for a canine unit. The dog alerted positive to the rear area of the defendant's

vehicle. One of the officers then drove the vehicle to the alley behind 4923 South Kildare.

While in the alley, the officers searched the vehicle a second time. This time, the canine alerted them to the bumper. Investigator O'Reilly observed that the nuts had been tampered with, and he disassembled and removed the rear bumper. Once the rear bumper was removed, Investigator O'Reilly observed a five- to six-inch piece of gray duct tape across the middle of the bumper. When the duct tape was removed, there were two sheet metal screws and a piece of sheet metal covering an opening. The officers removed the screws and the sheet metal came off. The officers observed a natural void in the manufacture of the car. Officer Feliciano retrieved 30 heat-sealed plastic bags containing United States currency totaling over $300,000 from the compartment. After making the discovery, the officers arrested the defendant.

On redirect examination, Officer Feliciano testified that the defendant did not sign a *Miranda* waiver while at the gas station. He also testified that the consent form did not give the officers permission to take the car bumper apart, and no one asked the defendant's permission to remove the bumper.

During questioning by the court, Officer Feliciano testified that nine officers participated in the approximately two-hour surveillance. The search at the gas station took between 10 to 25 minutes, and the canine unit arrived 10 minutes after the defendant left. With regard to the three other drivers' licenses that Spiegel gave to Officer Feliciano, two of the people had Hispanic surnames and the third person was African American.

The defendant testified that he checked into the hotel on April 19, 2005, paid cash, and gave his driver's license to a clerk, but Spiegel was not the clerk. On April 20, 2005, a Crown Victoria vehicle passed the defendant's vehicle and cut in front of him, and the officer in the vehicle signaled to the defendant to pull into the gas station. When the defendant pulled into the gas station, the Crown Victoria parked in front of him, and the other officers surrounded his vehicle. The officer in the Crown Victoria opened the defendant's door, told the defendant to get out of the car, grabbed the defendant by the arm, and walked the defendant to another officer. The other officer grabbed the defendant's belt loops and checked the defendant's pockets while the other officers began searching his vehicle. The officers then handcuffed the defendant and put him in a vehicle. After the officers finished searching the vehicle, Officer Feliciano gave the defendant a folded piece of paper that showed only the signature line. Officer Feliciano told the defendant to sign the paper and that he could go because they

found nothing in his vehicle. After the defendant signed the paper, the officers handcuffed him, put him in the police car, and drove him back to the house on Kildare, where he sat for approximately two hours before they drove him to the police station. According to the defendant, the officers did not read him his rights or tell him that he did not have to talk to them. He did not give them permission to remove the bumper.

On cross-examination, the defendant explained that he drove around in a circle because he was not familiar with the area and he got lost a couple of times. The defendant further testified that the officer told him that he was pulled over because he was not using his blinker. The defendant testified that although he can read and understand Spanish, he cannot comprehend what he is reading. The defendant learned at the police station that the police recovered money. The defendant admitted that he was interviewed at the police station, but he claimed that he never gave a statement. He recognized his signature on a statement, but he said that he signed the papers because the officers said that he would be able to leave. The State's motion for a directed finding was denied by the court.

## 2. The State's Case

The State put on its case and Officer Patrick Keating testified that on April 20, 2005, he was assigned to the HIDTA team. He was paying particular attention to the defendant because he had learned from Officer Feliciano that the defendant had been acting in a suspicious manner, that the defendant had been arrested with 3,000 pounds of marijuana in Georgia, and that the defendant was associated with marijuana trafficking and money laundering. At approximately 9:30 a.m., Officer Keating observed the defendant exit the hotel, look both ways, and walk back into the hotel. At 9:40 a.m., Officer Keating observed the same thing, except this time the defendant was on a cell phone. Officer Keating opined that the defendant's actions were consistent with someone who was conducting countersurveillance or was meeting someone. At 9:48 a.m., the defendant exited the hotel with a blue suitcase, walked to a vehicle, put the suitcase in the trunk, and drove away. Officer Keating testified that the defendant made a series of turns, pulled his vehicle to the side of the road, parked his vehicle, and waited a few minutes before pulling back into traffic. Officer Keating opined that the defendant was driving cautiously or suspiciously. The defendant entered an Auto Zone store and emerged with a small plastic white bag. After the defendant left the store, Officer Keating talked to the store clerk and learned that the defendant bought an allen-wrench-type screwdriver with a star. Officer Keating

observed the defendant pull into a garage and emerge from the garage approximately one hour later.

On cross-examination, Officer Keating testified that he and Officer Feliciano wrote a report on their surveillance, but the report did not indicate that the defendant pulled his vehicle over or that the defendant's driving was unusual or cautious after the defendant emerged from the garage.

Investigator Steve Liboy testified that on April 20, 2005, at approximately 10:30 a.m., he was conducting surveillance of the defendant. The parties stipulated that Investigator Liboy would testify that the defendant was driving suspiciously and that the defendant purchased an allen wrench. At approximately 12 p.m., Investigator Liboy arrived at the gas station in a covert vehicle wearing "soft clothes." The defendant was already out of his vehicle, and Officer Feliciano was talking to the defendant in Spanish. The defendant was read his rights in Spanish, and the defendant indicated that he understood his rights. Officer Feliciano asked for permission to search the defendant's vehicle, and Officer Feliciano presented the defendant with a preprinted consent form in Spanish. Investigator Liboy testified that the consent to search was not presented to the defendant with only the signature line showing; instead, the consent to search form was pulled out of a folder and the defendant was told that he did not have to sign the consent form. The defendant signed the consent, and Officers Arrigo and O'Reilly searched the vehicle. The officers found tool marks on the rear of the defendant's vehicle. After Investigator Liboy performed a protective pat-down on the defendant, the defendant was not handcuffed, and the defendant indicated that he wanted to cooperate and would take the police to the house where he was visiting a sick relative. They drove to 4923 South Kildare, and approximately 20 to 25 minutes later, Officer Feliciano advised him that the officers had found the money and placed the defendant under arrest.

Officer Robert Arrigo testified that on April 20, 2005, he was driving an unmarked Crown Victoria and performed a traffic stop. As he approached the vehicle from behind using his emergency lights and siren, the vehicle pulled over into a gas station. Officer Arrigo denied being in front of the vehicle or cutting off the vehicle. As Officer Arrigo began walking toward the vehicle, the defendant exited the vehicle. Officer Arrigo was armed but his weapon was not exposed. Officer Arrigo testified that he asked to see the defendant's driver's license and proof of insurance in a conversational tone. The defendant looked as though he did not understand. Officer Feliciano then approached the vehicle and began speaking to the defendant in Spanish.

Officer Arrigo denied approaching the defendant's vehicle, reaching into the vehicle, and pulling the defendant out of the vehicle. After Officer Feliciano obtained written consent to search the vehicle, Officer Arrigo searched the vehicle.

On cross-examination, Officer Arrigo testified that he did not see the defendant commit any traffic violations before the defendant's car was pulled over. Although Officer Arrigo testified that the defendant did not produce a license and registration, the officer's report stated that the defendant gave Officer Feliciano a Texas driver's license. He did not find contraband in the vehicle, but he noticed tool marks.

Investigator Kevin O'Reilly testified that he has had special training regarding trap cars. After he was informed that the defendant signed the consent to search form, he began examining the defendant's vehicle. He lay on the ground, looked under the vehicle, and found fresh tool marks on the bumper. He has seen similar marks hundreds of times and opined that someone had recently removed the bolts and put them back in the bumper. Investigator O'Reilly also testified that one of the bolts was missing and another was loose where the plastic cover of the bumper meets the wheel well, which was unusual for a regular vehicle. The officers requested a canine unit, and approximately 25 minutes later the dog alerted them to the rear of the vehicle. The vehicle was then taken to the alley on South Kildare. Investigator O'Reilly disassembled the "rear of the vehicle." Once he pulled the plastic cover off the bumper, he noticed that the rear of the vehicle had been altered. There was a piece of duct tape covering a piece of sheet metal. He pulled the duct tape off, and the sheet metal was attached with two self-tapping sheet metal screws. He removed one of the screws and a door flipped down. He looked into the cavity of the vehicle and observed heat-sealed bundles of United States currency. The parties stipulated that after the officers removed the bundles, the defendant was placed under arrest.

On cross-examination, Investigator O'Reilly testified that there were no pictures of the tool marks. He also testified that it was possible that the tool marks were there because someone was legitimately working on the vehicle.

Officer George Ohlin testified that on April 20, 2005, he was notified that the officers had seized some evidence and taken an individual into custody. Officer Ohlin interviewed the defendant at the police station. Officer Ohlin spoke exclusively in English, and the defendant was able to respond in English. He advised the defendant of his *Miranda* rights, and the defendant indicated that he was willing to talk. The interview was reduced to writing, and the defendant signed each page of the statement. The defendant told Officer Ohlin that he

gave the officers permission to search the vehicle and that the officers found the money.

### 3. The Trial Court's Findings

The court noted that the following facts led to Officer Feliciano conducting surveillance on the defendant: (1) Officer Feliciano received a phone call from a hotel clerk; (2) the clerk told Officer Feliciano that he saw the defendant on a cell phone, that the defendant asked if there was a pay phone in the hotel, and that the defendant paced in the lobby and parking lot; and (3) the defendant had a criminal background. The officers opined that the defendant was driving cautiously and suspiciously. Based on this information, the officers stopped the defendant's vehicle although the defendant had not violated any laws. The court found that the defendant's actions, as reported by Spiegel, were consistent with those of a law-abiding citizen. In addition, the defendant's driving idiosyncracies as reported by the officers were consistent with someone who was lost. The court found that at some point the defendant executed the consent form. The defendant testified that the document was folded in thirds and all he saw was the signature line. The court noted that the photocopy of the consent to search form showed dark markings, which were the locations of the folds on the original document. However, the court noted that the method in which the form was presented was in dispute. Regardless, the court did not believe that the execution of the consent form could "breathe legality into an otherwise unlawful stop." The court found that the defendant was held for an unreasonable amount of time given the fact that the officers could not point to a single violation of the law. Even if one were to assume that the consent form was enforceable, which the court did not assume, the court found that the removal of the bumper exceeded the scope of the authorized search. The court found that the defendant was under arrest at the gas station. The court granted the defendant's motion to quash his arrest and suppress evidence, and the State filed a certificate of substantial impairment. The instant appeal followed.

## II. ANALYSIS

### A. Standard of Review

This court, when reviewing a trial court's ruling on a motion to suppress evidence, reviews a trial court's findings of historical fact for clear error and gives deference to the trial court's inferences drawn from the facts. *People v. Cosby*, 231 Ill. 2d 262, 270-71 (2008) (quoting *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006), citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct.

1657, 1663 (1996)). A reviewing court only reverses a trial court's findings if they are against the manifest weight of the evidence. *Cosby*, 231 Ill. 2d at 271 (quoting *Luedemann*, 222 Ill. 2d at 542-43, citing *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001)). This court reviews the trial court's ultimate legal ruling *de novo* and may draw its own conclusions when deciding the relief to be granted. *Cosby*, 231 Ill. 2d at 271 (quoting *Luedemann*, 222 Ill. 2d at 542-43, citing *People v. Pitman*, 211 Ill. 2d 502, 512 (2004), *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663, and *Sorenson*, 196 Ill. 2d at 431).

## B. Parolee Detentions and Searches

■ The State contends that the trial court erred when it granted the defendant's motion to quash the arrest and suppress evidence because the defendant was on parole and therefore had a diminished expectation of privacy. We have reviewed the record and we discovered that the State did not argue in the trial court that the police could stop the defendant's car, without a warrant or probable cause, and temporarily detain the defendant because he was on parole. We also note that the State did not cite *Samson v. California*, 547 U.S. 843, 165 L. Ed. 2d 250, 126 S. Ct. 2193 (2006), in the trial court, although that case is relied upon by the State in its appellate brief. A party cannot make an argument for the first time on appeal. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005) ("forfeited" means issues that could have been raised in the trial court but were not are barred), citing *People v. Rogers*, 197 Ill. 2d 216, 221 (2001) (claims which could have been raised are forfeited); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (noting that in order to preserve an issue for appeal, a defendant must object at trial and raise the issue in a posttrial motion). Therefore, because the State did not argue in the trial court that the police could stop Vasquez, without a warrant or probable cause, because he was on parole, that issue is forfeited and we are not required to review it. *Blair*, 215 Ill. 2d at 443-44, citing *Rogers*, 197 Ill. 2d at 221; *Enoch*, 122 Ill. 2d at 186.

Forfeiture aside, we note that Officer Feliciano testified that the defendant was on parole at the time the HIDTA officers stopped his vehicle. It was the State's burden to provide the trial court with (1) a certified copy of the defendant's prior conviction, and (2) a certified copy of the conditions of the defendant's parole. See *People v. Brown*, 229 Ill. 2d 374, 388 (2008), citing *People v. Robinson*, 167 Ill. 2d 53, 75-76 (1995) ("a certified copy of a record of conviction satisfies the State's burden of production regarding the fact of that conviction"); 725 ILCS 5/114—12(b) (West 2004) (the judge shall receive evidence on any issue of fact necessary to determine the motion). Prior convic-

tions of an accused, like Vasquez, are only proved by public records. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §609.6 (9th ed. 2009); see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §301.4 (9th ed. 2009) (certification is *prima facie* evidence of authenticity); *People v. Bey*, 42 Ill. 2d 139, 146-47 (1969) (proof of conviction of infamous crime is established by a record of conviction or an authenticated copy); *People v. McCrimmon*, 37 Ill. 2d 40, 45 (1967). We are unable to consider this issue because the State failed to present the public records that proved that Vasquez was a convicted felon, that he was on parole and that conditions were placed on his parole. Without certified documents in the record to establish the fact of Vasquez's conviction, parole, and the conditions of his parole, neither the trial court nor this court can confirm the fact that the defendant was a convicted felon on parole and that a condition of the defendant's parole was that he was subject to a search by a police officer, without a warrant or probable cause, at any time and in any state. Accordingly, because the State has failed to provide a sufficient record for this court to review this issue and determine whether Vasquez was on parole and subject to a search, without a warrant or probable cause, at any time, we assume that the trial court's decision was correct. *People v. Lopez*, 229 Ill. 2d 322, 344 (2008) (the appellant bears the burden of providing a reviewing court with a complete record sufficient to support his claim of error, and any doubts that arise from the incompleteness of the record will be resolved against the appellant), citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

Even if we were to excuse the State's forfeiture of this issue and failure to provide a complete record, we would still find the State's reliance on *Samson* misplaced. In *Samson*, the petitioner was walking down the street. A police officer who was aware that the petitioner was on parole stopped the petitioner and, based solely on the petitioner's parolee status, searched the petitioner. The officer recovered narcotics from the petitioner's person and the petitioner was charged with possession of a controlled substance. The *Samson* court found that the conditions of California's parole were clearly expressed to the petitioner before the petitioner signed the parole agreement and required parolees to submit to suspicionless searches by either parole officers or police officers at any time. *Samson*, 547 U.S. at 852, 165 L. Ed. 2d at 259, 126 S. Ct. at 2199. Therefore, the *Samson* Court held that the suspicionless search did not violate the petitioner's fourth amendment rights. *Samson*, 547 U.S. at 852, 165 L. Ed. 2d at 259, 126 S. Ct. at 2199.

In *Samson*, the defendant was a convicted felon on parole, and the conditions of his parole required the defendant to submit to a suspicionless search by the police. In this case, the State failed to prove

that the defendant was a convicted felon, that he was on parole, and that the conditions of his parole permitted the police to make a suspicionless stop or a *Terry* stop. Therefore, we find that *Samson* does not provide support for the State's position.

## C. The Traffic Stop

■ Next, the State contends that the HIDTA team had a reasonable and articulable suspicion that the defendant was engaged in narcotics trafficking that justified an investigatory stop even though no one had seen the defendant commit a crime. The State argues in its brief that this was a *Terry* stop and maintains that the following facts justify the stop: (1) the defendant was on parole for possession with intent to deliver 3,000 pounds of marijuana; (2) the defendant had another prior conviction for possession and distribution of marijuana; (3) the defendant was driving a car with a Texas license plate and was from Mission, Texas, near the Mexico border; (4) the defendant checked into the hotel for only one night and paid in cash; (5) the defendant walked into the hotel talking on his cell phone, but asked for a pay phone; (6) the defendant paced in and out of the hotel lobby several times while looking over his shoulder; (7) the defendant paced in and out of the hotel parking lot and looked into the cars in the parking lot; (8) the defendant left the parking lot and drove in a two-block circle; (9) the defendant curbed his vehicle four times in a manner that the officers described as suspicious and countersurveillance; (10) the defendant talked on his cell phone while driving; (11) the defendant parked his car near the corner on 49th and Kildare even though there was plenty of parking available; (12) the defendant looked over his shoulder and spoke on the phone while walking on Kildare; (13) the defendant emerged from the house and drove in a countersurveillance fashion; (14) the defendant drove to Auto Zone and purchased a special kind of wrench; (15) the defendant drove down the alley and entered a garage; (16) the defendant "met another male Hispanic" who was standing near the overhead door of the garage; (17) the defendant emerged from the garage; and (18) the defendant was stopped less than a mile from Interstate 55.

The defendant argues that the State ignores the fact that the trial court listened to the aforementioned facts, weighed the officers' credibility, and found that the activity was just as likely to be innocent as criminal.

As stated above, we review a trial court's findings of historical fact for clear error and give deference to inferences the trial court draws from those facts. *Cosby*, 231 Ill. 2d at 271 (quoting *Luedemann*, 222 Ill. 2d at 542-43, citing *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663). The rationale for this deference is that the trial

court is in the best position to observe the conduct and demeanor of the witnesses, to assess the witnesses' credibility, and to give the appropriate weight to the evidence. *People v. Slater*, 228 Ill. 2d 137, 151 (2008), citing *Sorenson*, 196 Ill. 2d at 431.

The trial court judge reviewed the facts that led the officers to conduct surveillance, the fact that the officers testified that they stopped the defendant because he was driving cautiously and suspiciously, and the fact that the officers testified that they stopped the defendant although he had not violated any laws. The trial court found (1) that the defendant's actions at the motel reported by the motel clerk, Spiegel, were consistent with those of a law-abiding citizen; (2) that the defendant's driving idiosyncracies that were reported by the officers were consistent with the driving problems of a lost driver; (3) that the consent to search form did not make an unlawful stop legal, noting that the photocopy of the consent to search form showed dark markings, which were in the same locations as the folds on the original consent form; (4) that the defendant was held for an unreasonable amount of time given the fact the officers could not point to a single violation of law; and (5) that the removal of the defendant's car bumper exceeded the scope of the consent, if the court assumed, which it did not, that the consent was enforceable. After reviewing the trial court's findings, we find that they were not against the manifest weight of the evidence; therefore, there is no clear error. *Cosby*, 231 Ill. 2d at 271 (quoting *Luedemann*, 222 Ill. 2d at 542-43, citing *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663).

Having found that the trial court's findings were not against the manifest weight of the evidence, we begin our review of the police officers' stop and search of the defendant and his vehicle with the fourth amendment. The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, article I, section 6, of the Illinois Constitution of 1970 guarantees that "[t]he people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. 1970, art. I, §6.

We also note that there are three types of police-citizen encounters: (1) consensual encounters,[2] which involve no coercion or detention

---

[2]In *Luedemann*, the Illinois Supreme Court noted that consensual encounters have previously and imprecisely been called "community caretaking function." *Luedemann*, 222 Ill. 2d at 544.

and thus do not implicate fourth amendment interests; (2) brief investigative detentions (commonly referred to as *Terry* stops), which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) arrests, which must be supported by probable cause. *Luedemann*, 222 Ill. 2d at 544 (citing *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982), and *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982)). First, we find that this was not a consensual encounter between Vasquez, who was driving his vehicle on a public street, and the officers because the evidence failed to establish that the defendant or a person connected to the defendant was in need of the officer's assistance at the time of the stop. *Luedemann*, 222 Ill. 2d at 544.

Second, the State maintains that the police were conducting a narcotics investigation and that the pullover of Vasquez's vehicle was a *Terry* stop. We note that the temporary detention of an automobile even if for a brief period of time and for a limited purpose constitutes a seizure under the fourth amendment. *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996). An automobile stop is subject to a constitutional imperative that it is not unreasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996). An automobile traffic stop is reasonable when the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996).

In *Delaware v. Prouse*, 440 U.S. 648, 663, 59 L. Ed. 2d 660, 673, 99 S. Ct. 1391, 1401 (1979), the United States Supreme Court held that a police officer may make a *Terry* stop of an automobile if the officer has a reasonable and articulable suspicion (1) that the driver is unlicensed, (2) that the vehicle is unregistered, or (3) that the vehicle or an occupant is subject to seizure for a violation of a law. *Prouse*, 440 U.S. at 663, 59 L. Ed. 2d at 673, 99 S. Ct. at 1401. Here, the officers did not testify that they detained the defendant (1) because they had a reasonable suspicion that the defendant was unlicensed, (2) because the vehicle was unregistered, or (3) because the defendant's vehicle or the defendant was subject to seizure for a violation of a law (the officers acknowledged that they did not witness the defendant violate any law). In fact, the officers knew that the defendant had a driver's license because Spiegel gave them a copy of the defendant's license. We find that the State failed to present any evidence that established that the defendant or his vehicle was unlicensed. Therefore, we hold that the *Terry* stop was unreasonable because the police failed to detain or stop the defendant's vehicle in compliance with *Prouse*. *Prouse*, 440 U.S. at 663, 59 L. Ed. 2d at 673, 99 S. Ct. at 1401; see also *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772.

The Illinois Supreme Court holds that a reviewing court, when reviewing a *Terry* stop, must determine (1) whether the officer's action was justified at its inception, and (2) whether the action was reasonably related in scope to the circumstances that initially justified the stop. *Cosby*, 231 Ill. 2d at 275. First, we note that the officers testified that they followed Vasquez for two hours and did not observe him commit an offense. Therefore, because the officers had no arrest warrant or search warrant and did not observe the defendant commit an offense, including a traffic offense, we hold that the traffic stop was not justified at its inception. *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772; *Cosby*, 231 Ill. 2d at 275; *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005).

Second, we must determine whether the police action was reasonably related in scope to the circumstances that initially justified the stop. The 40- to 50-minute detention for the search of the vehicle, the removal of the bumper, and the sniff by the dog (*Caballes*, 543 U.S. at 408, 160 L. Ed. 2d at 846, 125 S. Ct. at 837 (a dog sniff violates the constitution if it is conducted while the defendant is being unlawfully detained) were not reasonably related in scope to the circumstances that initially justified the stop because, without observing an offense, the police did not have probable cause to stop Vasquez or search his vehicle. *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772. Therefore, the police officers' action, the decision to initiate a *Terry* stop of Vasquez and the decision to search his vehicle, was not reasonable in scope because the stop was not justified at its inception. *Cosby*, 231 Ill. 2d at 275; *Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834.

Here, we found that the trial court's findings, that the defendant's actions before the defendant left the motel and while he was driving were consistent with the actions of someone who was lost, were not against the manifest weight of the evidence. Because the defendant did not commit a crime and his actions were consistent with those of a law-abiding citizen, the officers had no specific facts that provided them with a reasonable suspicion that the defendant was engaged in criminal activity. See *Prouse*, 440 U.S. at 663, 59 L. Ed. 2d at 673, 99 S. Ct. at 1401; *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; see also *People v. Love*, 199 Ill. 2d 269, 275 (2002). Therefore, we find that the traffic stop was unreasonable because the officers had no facts in their possession that a crime had been or was about to be committed by the defendant that would permit them to conduct a *Terry* stop. Accordingly, we hold that the trial court did not err when it granted the defendant's motion to quash arrest and suppress evidence because the police did not possess facts that justified the detention of the defendant

or the search of his vehicle without a warrant, probable cause, or a reasonable suspicion of criminal activity. *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772; *Prouse*, 440 U.S. at 663, 59 L. Ed. 2d at 673, 99 S. Ct. at 1401; *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *Cosby*, 231 Ill. 2d at 271.

We note that there is a recent, consolidated Illinois Supreme Court case, *Cosby*, where the police made traffic stops. In *Cosby*, both of the defendants were pulled over by the police for traffic violations; therefore, the police had probable cause to initiate the traffic stops. *Cosby*, 231 Ill. 2d at 271. In the instant case, the police had no probable cause to stop the defendant's vehicle because the officers did not observe Vasquez commit a traffic offense or any other offense. Accordingly, we find *Cosby* and *Mendoza* would not provide support for the State's position.

## D. Detention or Arrest

■ In light of our holding that the police lacked probable cause to stop the defendant and seize his vehicle and that the defendant was not legally detained pursuant to *Terry* or *Prouse*, this court must next determine whether the trial court properly found that the defendant was under arrest at the gas station. A person is arrested when his freedom of movement is restrained by physical force or a show of authority. *People v. Washington*, 363 Ill. App. 3d 13, 23 (2006), citing *People v. Barlow*, 273 Ill. App. 3d 943, 949 (1995). In determining whether an arrest has occurred, this court must determine whether, in light of the surrounding circumstances, a reasonable innocent person would have considered himself free to leave. *Washington*, 363 Ill. App. 3d at 23-24, quoting *People v. Wallace*, 299 Ill. App. 3d 9, 17 (1998). Illinois courts consider the following factors in determining whether an arrest has occurred: (1) the time, place, length, mood, and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether the defendant was told he could refuse to accompany the police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers. *Washington*, 363 Ill. App. 3d at 24, citing *People v. Jackson*, 348 Ill. App. 3d 719, 728 (2004); *Barlow*, 273 Ill. App. 3d at 949. No single factor is dispositive, and in each case the court considers all of the circumstances surrounding the detention. *Washington*, 363 Ill. App. 3d at 24, citing *People v. Reynolds*, 257 Ill. App. 3d 792, 800 (1994).

■ We note that nine officers were involved in the surveillance of the defendant and four officers were involved in the detention of the defendant and the search of his vehicle in the gas station: Officer Feliciano and Investigator Liboy interrogated the defendant, and Officer Arrigo and Investigator O'Reilly searched his vehicle. After the seizure of Vasquez's vehicle in the gas station, Officer Feliciano testified that another officer drove the defendant's vehicle from the gas station to the Kildare location. We found that the officers stopped the defendant's vehicle without a warrant, probable cause or a reasonable suspicion of criminal activity by the defendant. Therefore, the detention of the defendant's vehicle for 10 to 25 minutes at the gas station and for an additional 25 minutes at 49th and Kildare constituted a seizure of the defendant's vehicle under the fourth amendment. *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772. Accordingly, we hold that the police violated the defendant's fourth amendment rights when they seized the defendant's vehicle. *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772.

After seizing the defendant's vehicle, the defendant was detained at the gas station for 10 to 25 minutes. During his detention, he was read his *Miranda* rights, frisked, and seated in the backseat of an unmarked police car which, as the trial court observed, is normally reserved for suspects. Moreover, not only was the defendant not told that he was free to leave at any time, but the police, after seizing his vehicle, drove it from the gas station to the Kildare location. We find that the defendant would have had difficulty leaving the scene without a vehicle because he was from another state. Because the defendant and his vehicle were seized by the police in violation of the fourth amendment and the defendant was "Mirandized," frisked, seated in a police car, and dispossessed of his vehicle for over 40 or 50 minutes, we find that he was under arrest. Although none of these individual facts is dispositive (*Washington*, 363 Ill. App. 3d at 24, citing *Reynolds*, 257 Ill. App. 3d at 800), taken together, we find that after seizing the defendant's vehicle, the defendant was arrested at the gas station because a reasonable person from another state without a car would not have considered himself free to leave with two officers interrogating him and two officers searching his vehicle. *Washington*, 363 Ill. App. 3d at 23-24, citing *Wallace*, 299 Ill. App. 3d at 17. Therefore, we hold that the trial court did not err when it found that the defendant was arrested at the gas station.

The State cites *People v. Sturgess*, 364 Ill. App. 3d 107, 113 (2006), and maintains that a defendant is neither seized nor arrested where the defendant voluntarily accompanies an officer to a police station and there is no formal declaration of arrest and the defendant is not

searched, handcuffed, fingerprinted, or photographed. As the United States Supreme Court noted in *Prouse*, stopping an automobile and detaining its occupants constitutes a seizure. *Prouse*, 440 U.S. at 653, 59 L. Ed. 2d at 667, 99 S. Ct. at 1396. In *Sturgess*, we note that the defendant's car was not stopped by the police for a narcotics investigation; instead, the defendant was involved in an automobile accident and was transported to a police station for an accident investigation. *Sturgess*, 364 Ill. App. 3d at 113. In this case, the police followed the defendant for two hours, stopped the defendant's vehicle without a warrant or probable cause, seized the defendant and searched his vehicle. Then, the defendant was "Mirandized," frisked, dispossessed of his vehicle, seated in the backseat of a police vehicle and transported to the Kildare location. Because the defendant and his vehicle were seized in violation of the fourth amendment, the defendant did not voluntarily accompany the officers to the second Kildare location. *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772. Accordingly, *Sturgess* is inapposite and fails to provide support for the State's position.

## E. The Defendant's Consent

■ The trial court also found that the defendant's signing the consent form to search the vehicle was not voluntary. An individual may consent to a search, thereby eliminating the need for probable cause and a search warrant. *People v. Ledesma*, 206 Ill. 2d 571, 592 (2003), *overruled on other grounds. People v. Pitman*, 211 Ill. 2d 502, 513 (2004) (citing *People v. Phillips*, 264 Ill. App. 3d 213, 217 (1994), and *People v. Cardenas*, 237 Ill. App. 3d 584, 587 (1992)). "A consent to search is valid under the fourth amendment if it is voluntary." *Ledesma*, 206 Ill. 2d at 592-93, citing *Ohio v. Robinette*, 519 U.S. 33, 40, 136 L. Ed. 2d 347, 355, 117 S. Ct. 417, 421 (1996). "Voluntariness is a question of fact to be determined from the totality of the circumstances." *Ledesma*, 206 Ill. 2d at 593, citing *Robinette*, 519 U.S. at 39, 136 L. Ed. 2d at 354, 117 S. Ct. at 421.

We found (1) that the police stopped the defendant's vehicle without a warrant, probable cause or a reasonable suspicion of criminal activity pursuant to *Terry*, (2) that the defendant was not detained pursuant to *Prouse*, and (3) that the defendant was arrested at the gas station. The Illinois Supreme Court has noted that "[o]nce an illegal seizure has occurred, that illegality may infect and taint the fruits that subsequently resulted." *People v. Brownlee*, 186 Ill. 2d 501, 518 (1999), citing *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). See also *People v. Jones*, 346 Ill. App. 3d 1101, 1106 (2004) (finding that, after providing a valid driver's license

and insurance information, the defendant was illegally detained at the time he gave consent to the search, and the consent and the resulting search were tainted and the fruits thereof should have been suppressed) (citing *Brownlee*, 186 Ill. 2d 501, citing *Wong Sun*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407); see also *People v. Thompson*, 337 Ill. App. 3d 849, 853 (2003) (holding that once the illegal seizure occurred, that illegality tainted the consent, evidence, and arrests that subsequently resulted), citing *Brownlee*, 186 Ill. 2d at 521. Because the defendant was stopped and his vehicle was seized at the gas station without a warrant, probable cause, or a reasonable suspicion of criminal activity, the defendant's arrest was illegal and the execution of the consent to search was not voluntary and was tainted by his illegal arrest. Accordingly, the fruits of the illegal arrest (the United States currency) were properly suppressed by the trial court. *Brownlee*, 186 Ill. 2d at 518, citing *Wong Sun*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.

Next, we must determine whether the State presented facts that attenuated the taint of the illegal arrest. The burden of demonstrating attenuation between the illegal arrest of the defendant, the illegal seizure of his vehicle and the execution of the consent and the discovery of the money is on the State. *People v. White*, 117 Ill. 2d 194, 222-23 (1987), citing *Brown v. Illinois*, 422 U.S. 590, 604, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2262 (1975). The evidence established that the police pulled the defendant's vehicle over to investigate whether the defendant was engaged in narcotics trafficking; that the police seized the defendant's vehicle at the gas station; that the police arrested the defendant at the gas station because they suspected that he was engaged in narcotics trafficking; and that the police drove his vehicle to the Kildare location in order to continue their investigation into whether the defendant was engaged in narcotics transactions. We find that the arrest of the defendant, the seizure of his vehicle and the execution of the consent by the defendant are so inextricably connected in temporal proximity that there was no attenuation that purged the defendant's consent of the taint of the illegal arrest. Moreover, the State failed to establish that there was an intervening circumstance or that they had independent probable cause to initiate the *Terry* stop to obtain the consent to authorize the search of the defendant's vehicle. *People v. Morris*, 209 Ill. 2d. 137, 160 (2004). Accordingly, we hold that the State failed to establish attenuation between the illegal arrest of the defendant, the illegal seizure of his vehicle and the defendant's execution of the consent to search his vehicle. *Morris*, 209 Ill. 2d at 160; *White*, 117 Ill. 2d at 222-23 (1987), citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975).

## F. The Scope of the Consent to Search

■ The trial court also found that even if the consent to search was proper, the search exceeded the scope of consent. When reviewing the scope of a suspect's consent, courts use a standard of objective reasonableness, which requires consideration of what a typical reasonable person would have understood by the exchange between the officer and the suspect. *Florida v. Jimeno*, 500 U.S. 248, 251, 114 L. Ed. 2d 297, 302, 111 S. Ct. 1801, 1803-04 (1991).

In the instant case, we note that the trial court found that the removal of the bumper exceeded the scope of the search. We also note that Officer Feliciano testified that the defendant's consent form did not give the officers permission to remove the vehicle's bumper.[3] The officer's testimony establishes that the defendant's consent did not give the officers permission to remove his bumper. Accordingly, given the officer's testimony and given the fact that the officers seized and searched the defendant and his vehicle without a warrant, probable cause or a reasonable suspicion, we hold that the trial court properly found that the police officers' removal of the vehicle's bumper exceeded the scope of the defendant's consent. *Jimeno*, 500 U.S. at 251, 114 L. Ed. 2d at 302, 111 S. Ct. at 1803-04; see also *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772.

## G. Conflicting and Evasive Answers

■ Next, the State contends that the continued detention of the defendant was justified because the defendant allegedly gave conflicting and evasive answers to the officers. However, the State did not argue in the trial court that they were authorized to search the defendant's vehicle as a result of the defendant's answers to the officers' questions; rather, the State argued in the trial court that the officers searched the defendant's vehicle because the defendant signed the consent to search form. Because the State did not make this argument in the trial court, the State's argument is forfeited. *Blair*, 215 Ill. 2d at 443-44. Forfeiture aside, because the initial stop of the defendant's

---

[3]In light of the requirement in the fourth amendment and article I, section 6, of the Illinois Constitution that warrants only issue which state with particularity the place to be searched and the person or things to be seized (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6; 725 ILCS 5/108—7 (West 2004)), it seems reasonable that an officer who presents a consent to search form to a citizen on the street should similarly delineate on the consent to search form the place or person to be searched and the things to be seized. It would be easier to decide the scope issue in this case if the officers had specified on the consent form the place in the car they intended to search and the person or things to be seized.

vehicle was made without a warrant, probable cause, or a reasonable suspicion of criminal activity, the defendant's conflicting and evasive answers would not justify the *Terry* stop, the arrest of the defendant or the search of his vehicle. *Whren*, 517 U.S. at 809-10, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772.

## III. CONCLUSION

In conclusion, we find that the police did not have an arrest warrant for the defendant, a search warrant for his vehicle, probable cause, or a reasonable suspicion of criminal activity that would justify a *Terry* stop, arresting the defendant or having him execute the consent to search form. The fourth amendment is violated when the police, without a warrant, probable cause or a reasonable suspicion of criminal activity, arrest citizens and search their vehicles by inspecting the undercarriage of their vehicles, by removing the bumpers of their vehicles, and by having a dog sniff their vehicles. Accordingly, we hold that the defendant's fourth amendment rights were violated by the police in this case; therefore, the trial court did not err when it granted the defendant's motion to quash arrest and suppress evidence.

Affirmed.

O'BRIEN, P.J., and GALLAGHER, J., concur.