# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Kats*, 2012 IL App (3d) 100683

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. VLADISLAV KATS, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-10-0683 |
| Filed | March 9, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for unlawful possession of cannabis with intent to deliver, the trial court's grant of defendant's motion to suppress the cannabis discovered behind a door panel in defendant's car following a traffic stop was reversed, where the court's conclusion that the duration of the traffic stop was unreasonable was manifestly erroneous, since the stop concluded after the officer issued a warning ticket, at that time defendant consented to a search of his vehicle, and the officer did not exceed the scope of the consent when he used a screwdriver to pry open a door panel that was already slightly ajar. |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 08-CF-1178; the Hon. Walter D. Braud, Judge, presiding. |
| Judgment | Suppression order reversed; cause remanded. |

Counsel on
Appeal

Jeff Terronez, State's Attorney, of Rock Island (Terry A. Mertel and Laura E. DeMichael, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel P. Dalton, of Rock Island, for appellee.

Panel

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Carter concurred in the judgment and opinion.
Presiding Justice Schmidt specially concurred, with opinion.

**OPINION**

¶ 1    The defendant, Vladislav Kats, was charged with unlawful possession with intent to deliver cannabis in violation of section 5(f) of the Cannabis Control Act (720 ILCS 550/5(f) (West 2008)). The defendant filed a motion to quash his arrest and suppress the evidence seized against him. After conducting a hearing, the trial court denied the motion. However, the trial court subsequently granted the defendant's motion to reconsider and entered an order suppressing the evidence. The State timely filed an interlocutory appeal of the trial court's suppression order under Illinois Supreme Court Rule 604(a)(1). Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2006).

¶ 2                                            FACTS

¶ 3    Sergeant Clint Thulen of the Illinois State Police was the only witness to testify during the hearing on the defendant's motion to quash arrest and suppress evidence. Thulen had been a police officer for 19 years and was specially trained in drug interdiction. He had also received special training in drug searches during the 10 years that he served as a K-9 handler.

¶ 4    Thulen testified that, on November 3, 2008, at approximately 9:30 p.m., he was on duty driving in his squad car. As he attempted to merge onto I-80 eastbound, he saw a Toyota Sequoia traveling parallel to him in the right lane. Instead of passing Thulen's squad car or allowing it to merge in front of him, the driver of the Toyota slowed as Thulen slowed, so the cars remained parallel. Thulen slowed down below the minimum speed limit to avoid hitting the Toyota. The Toyota then slowed down, moved in front of Thulen, and pulled over onto the shoulder. Thulen turned on his squad car lights and pulled behind the Toyota, which had stopped on the shoulder. Thulen stopped his car and notified dispatch that he was effecting a motorist assist. He then exited his squad car and approached the Toyota on the passenger's side.

¶ 5    Thulen spoke to the defendant, who was the driver of the Toyota. The defendant told

Thulen that he had pulled over to change his shoes. At that point, Thulen decided that it would be appropriate to give the defendant a written warning for failure to merge. The defendant presented a California driver's license, but the rented vehicle he was driving was registered in Arizona. Thulen examined the rental agreement, which revealed that the vehicle had been rented in Las Vegas for approximately $950. The defendant told Thulen that he was moving from Las Vegas to Buffalo, New York. However, Thulen noticed that there were mattresses and other large items in the vehicle which Thulen did not believe were the type of items that people who are moving usually have in their vehicles.

¶ 6    Thulen told the defendant that he was going to give the defendant a written warning and asked the defendant to accompany him to his squad car while he wrote the ticket. The defendant sat next to Thulen in the passenger seat of the squad car. Thulen began writing the ticket, notified dispatch that the motorist assist had turned into a traffic stop, called for a nonemergency assist, and ran routine computer checks on the driver and the vehicle by radio. The person performing the computer checks informed Thulen by radio that the defendant had an FBI number. Thulen claimed that the defendant appeared nervous and trembled continuously from the beginning of the traffic stop.

¶ 7    After Thulen wrote the ticket, he and the defendant exited the squad car, and Thulen handed the defendant the ticket. The defendant then began to walk away. Thulen then said "Sir?" In response, the defendant turned around started walking back toward Thulen. Thulen told the defendant that the traffic stop was over and that he was free to go and asked if he could ask the defendant a few questions. Thulen asked the defendant if there was anything illegal in the vehicle and if there was any possibility that anyone else had put something in the vehicle of which the defendant was not aware. The defendant answered "no" to both questions. Thulen then asked the defendant if he was responsible for everything in the vehicle, and the defendant responded that he was. Thulen then asked if he could search the vehicle and its contents for contraband. The defendant answered "yes." Thulen told the defendant that he could wait in Thulen's squad car "where it was a little warmer" while Thulen conducted the search. The defendant did so.

¶ 8    Thulen then began to search the vehicle. While he was searching inside the vehicle, Trooper Steen arrived on the scene. Thulen told Steen that he had suspicions that there was contraband in the car, and the two officers began searching the interior of the car together. They found two Motorola "hand held walkie-talkie type" radios, a plane ticket with the name McHugh on it, an energy drink, and fast-food wrappers on the floorboard. However, they did not find any drugs or other contraband visible in the car's interior. Nevertheless, Thulen testified that, based upon his training, education, and experience, the contents of the vehicle and the observations that Thulen had made from the beginning of the traffic stop "led [him] to believe that criminal activity was afoot."

¶ 9    After searching for approximately eight minutes, Thulen went back to his squad car to get a screwdriver. He brought the screwdriver back to the defendant's vehicle and he used it to pop off the dashboard panel. Thulen testified that he did this because, according to his experience and training, the space behind the dashboard panel is "a likely location for contraband to be hidden." However, Thulen found no contraband in that location.

¶ 10    Thulen testified that he then looked at the underside of the rear passenger door "a little

more carefully" and noticed that the plastic part of the door was pulled slightly away from the metal framework of the door. Thulen used the screwdriver to pry back the plastic part of the door far enough to shine a flashlight into that location and "look back behind *** that area." He saw that the "heavy semi-clear plastic liner between the plastic interior skin of the vehicle and the metal door" "had been pulled off" and "there were cuts in it." Behind the semi-clear plastic liner, Thulen could see that there were several "food saver wrapped bundles" lodged in the empty space contained in the metal interior of the door. He used an upholstery tool to pry back the plastic door panel further so he could access the bundles. Thulen recognized the bundles as being consistent with illegal street drugs, and he arrested the defendant. Ultimately, the search resulted in the discovery of nine bundles of cannabis weighing more than seven pounds.

¶ 11 In his motion, the defendant argued that the evidence seized should be suppressed because the length of the defendant's detention during the traffic stop was unreasonable and because the search of his vehicle exceeded the scope of the consent given by the defendant. After hearing oral argument, the trial court found that Thulen had spent "an inordinate amount of time, 10, 15 minutes, to get the traffic ticket worked" and that it was "fairly evident" that Thulen was "waiting for the backup vehicle." However, the trial court concluded that detaining a motorist for 15 minutes while writing a warning ticket is "not too long" and is "not a period of time where the Court can say, just on the basis of how long it took, you have seized this person, and you have not discharged him within a reasonable period of time."[1]

¶ 12 Regarding the scope of consent, the trial court ruled that "it seems reasonable to me that a police officer, particularly a state trooper on a highway, is going to search the car in the manner that this vehicle was searched." The court noted that searching for narcotics inside a removable dashboard and door panels that could be easily put back into place is "routinely done" and noted that "I can't imagine that the courts would hamstring the police officers to the extent that you can only search what you can see with your naked eye or poke around and find, because it would just be a green light to anyone who wants to traffic." Accordingly, the court denied the defendant's motion to suppress.

¶ 13 However, the trial court later granted the defendant's motion to reconsider and suppressed the evidence. The trial court's order granting the defendant's motion to reconsider states that "[t]he duration of the stop (10-15 minutes) was excessive," and that Thulen's "use of tools to enter closed compartment [*sic*] of the car is outside the scope of consent." In explaining its reversal, the court noted that it had initially believed that the duration of the stop was excessive, but the court did not initially "hang [its] hat on that" because it found that the defendant had consented to the search. However, the court changed its mind and

---

[1]The trial court found that the traffic stop and the writing of the ticket were a "charade" because Thulen likely knew from the beginning that he wanted to search the defendant's car for drugs. It also found that Thulen's claim that the defendant appeared nervous was incredible and was refuted by the videotape, which showed the defendant acting calmly throughout the traffic stop. Nevertheless, the court concluded that there was nothing illegal about the stop because the defendant stopped his car before being pulled over by Thulen and later voluntarily consented to the search.

concluded that the search "took too long even though he consented."[2] Moreover, the court noted that it had read certain cases provided by the defendant which convinced the court that a consent to search a vehicle for contraband does not include consent to a police officer's use of pry tools to open closed compartments where the officer cannot see contraband.

¶ 14    The State filed a certificate of impairment and timely appealed the trial court's suppression order under Supreme Court Rule 604(a)(1). Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2006).

¶ 15                                                    ANALYSIS

¶ 16    In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under this standard, findings of fact made by the trial court are given "great deference" and will be upheld on review unless they are against the manifest weight of the evidence. However, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Luedemann*, 222 Ill. 2d at 542; *Sorenson*, 196 Ill. 2d 425, 431 (2001).

¶ 17                                   A. The Duration of the Traffic Stop

¶ 18    The fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The fundamental purpose of these provisions is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. *People v. Baltazar*, 295 Ill. App. 3d 146, 149 (1998); see also *People v. Dilworth*, 169 Ill. 2d 195, 201 (1996). A seizure that is lawful at its inception can violate the fourth amendment if its manner of execution unreasonably infringes interests protected by the Constitution. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *People v. Harris*, 228 Ill. 2d 222, 235 (2008). For example, a traffic stop that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is "prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407; see also *Harris*, 228 Ill. 2d at 235.

¶ 19    There is no talismanic period of time beyond which an initially justified traffic stop becomes an unreasonable seizure under the fourth amendment. *People v. Koutsakis*, 272 Ill. App. 3d 159, 163 (1995). However, the brevity of the stop is an important factor when determining whether the stop is reasonable. *Id.* at 163-64. Courts must consider the purpose to be served by the stop as well as the time reasonably needed to effectuate those purposes.

---

[2]The trial court repeated that Thulen's testimony that the defendant appeared nervous was not credible and noted that Thulen would not have had probable cause to search the vehicle if the defendant had not consented. The court also noted that it had heard a "couple" of prior cases involving Thulen and that Thulen's "MO is always the same, and it's always outside the boundary, and he just keeps doing it anyway." Thus, the court noted that, if the defendant had not consented, it would have initially granted the defendant's motion to suppress.

*Id.* at 164. An officer's authority to investigate a traffic violation "may not become a subterfuge in order to obtain other evidence merely based on the officer's suspicion." *Id.*

¶ 20    Applying these standards, we conclude that the duration of the traffic stop at issue in this case was reasonable. The videotape of the traffic stop shows that approximately nine minutes elapsed from the time that Thulen first spoke to the defendant until he handed the defendant the warning ticket and told him that he was free to leave.[3] At that point, the initial seizure was over. See, *e.g.*, *People v. Cosby*, 231 Ill. 2d 262, 276 (2008) (traffic stop ends when officer returns the defendant's paperwork). During those nine minutes, Thulen conversed briefly with the defendant, walked back to his squad car, notified dispatch that the motorist assist had turned into a traffic stop, ran routine computer checks on the driver and the vehicle by radio, and wrote the warning ticket. Nine minutes is not an unduly long period of time to complete those tasks. See, *e.g.*, *People v. Staley*, 334 Ill. App. 3d 358, 366 (2002) (traffic stop lasting " 'somewhat more than 18 minutes' " was not unreasonably long where the police officer confirmed the status of the defendant's driver's license and her license plate registration and wrote two traffic citations during that time period).

¶ 21    Moreover, there is no evidence that Thulen prolonged the traffic stop after handing the defendant the ticket in an attempt to obtain incriminating evidence. Immediately after drafting the warning ticket and handing it to the defendant, Thulen told the defendant that he was free to leave and that the traffic stop had concluded. That distinguishes this case from cases where we have found that a traffic stop was unreasonably prolonged. See, *e.g.*, *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034-35 (2009) (duration of traffic stop held unreasonable where officer prolonged stop approximately 9½ minutes after he decided not to give the defendant a ticket by questioning defendant and calling for a drug-sniffing dog); *Koutsakis*, 272 Ill. App. 3d at 164 (duration of detention held unreasonable where officer detained the defendant for several minutes after writing the warning ticket while waiting for another officer to arrive with a drug-sniffing dog).

¶ 22    The defendant does not, and cannot, argue that Thulen's subsequent search of the vehicle was somehow a continuation of the initial seizure. See *Cosby*, 231 Ill. 2d at 276. Nor does he argue that Thulen's actions after the traffic stop had concluded constituted a second seizure of the defendant. To the contrary, the defendant concedes that he freely consented to the search. Accordingly, Thulen's actions after the initial traffic stop had concluded (including his search of the vehicle) were not part of the traffic stop and cannot be considered in determining whether Thulen unreasonably prolonged the traffic stop. Only those actions that Thulen took during the nine minutes of the initial traffic stop are relevant to that inquiry. As noted above, there is no evidence that Thulen unreasonably prolonged the traffic stop during that time period.

---

[3]The videotape shows that Thulen told the defendant that he was going to write him a warning ticket approximately one minute into their conversation. The State argues that it was not until this point that a seizure occurred because, beforehand, a reasonable person in the defendant's position would have felt free to leave. If the State is correct, the duration of the traffic stop was eight minutes, not nine minutes. We do not need to decide this issue, however, because we find that a traffic stop of nine minutes was reasonable under the circumstances presented in this case.

¶ 23    The trial court did not explain why it reversed itself and concluded the duration of the traffic stop was unreasonable. However, the trial court's conclusion appears to be based primarily on two factual findings: (1) that the traffic stop lasted "10-15 minutes," and (2) that the writing of the ticket was a pretextual "charade" and Thulen's real purpose was to cajole the defendant into consenting to a vehicle search while waiting for another officer to arrive on the scene. These findings are against the manifest weight of the evidence. The videotape conclusively shows that the traffic stop lasted between 8 and 9 minutes, not 10 to 15 minutes. (As noted above, the traffic stop ended when Thulen gave the defendant the ticket, and Thulen's subsequent search of the defendant's vehicle was not part of the traffic stop.) The defendant concedes that the stop lasted no more than nine minutes. Moreover, the trial court conceded that it was lawful and proper for Thulen to issue the defendant a written warning for failure to merge, and there is nothing in the record suggesting that Thulen took longer than he needed to accomplish that task. Thus, regardless of whether Thulen also had some other purpose in mind, the record does not support the inference that Thulen unreasonably prolonged the traffic stop.[4]

¶ 24    In sum, the evidence establishes that Thulen detained the defendant for no longer than it took to write a warning ticket and to complete other legitimate tasks incident to a reasonable and lawful traffic stop. The trial court's conclusion that the duration of the traffic stop was unreasonable was manifestly erroneous, and suppression of the evidence seized by Thulen is not warranted on that basis.

¶ 25                    B. The Scope of the Defendant's Consent to Search the Vehicle

¶ 26    The trial court ruled that Thulen's search of the defendant's vehicle exceeded the scope of the consent given by the defendant because Thulen used tools to enter a closed compartment of the vehicle. We disagree. It is well settled that an individual may consent to a search conducted without a warrant, thereby eliminating the need for probable cause and a search warrant. *People v. Ledesma*, 206 Ill. 2d 571, 592 (2003), *overruled on other grounds by People v. Pitman*, 211 Ill. 2d 502, 513 (2004). However, when the police rely upon consent as the basis for a warrantless search, they "have no more authority than they have apparently been given by the voluntary consent of the defendant." *Baltazar*, 295 Ill. App. 3d at 149.

¶ 27    The standard for measuring the scope of a suspect's consent is that of "objective reasonableness," which requires consideration of what a "typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Ledesma*, 206 Ill. 2d at 593; *People v. Vasquez*, 388 Ill. App. 3d 532, 553 (2009); *Baltazar*, 295 Ill. App. 3d at 149-50. The scope of a search is defined by its expressed object or purpose. *Jimeno*, 500 U.S. at 251; *Ledesma*, 206 Ill. 2d at 593. "By

---

[4]Nor does the record support the inference that Thulen was waiting for another officer to arrive and assist with the search. Thulen completed the warning ticket, asked for and received the defendant's consent to search the vehicle, and began searching the vehicle before Trooper Steen arrived.

indicating to the suspect the intended object of the search either directly or by revealing a suspicion of specific criminal activity, a police officer not only 'apprises the suspect that his constitutional rights are being impacted, but he also informs the suspect of the reasonable parameters of his inquiry.' " *Ledesma*, 206 Ill. 2d at 593 (quoting *Baltazar*, 295 Ill. App. 3d at 150).

¶ 28     Applying these standards, courts have determined that an officer may search unlocked containers found inside the area being searched if it would be reasonable to find the stated object of the search in such containers. See, *e.g.*, *Jimeno*, 500 U.S. at 251 (defendant's consent to search his car included search of a small paper bag found in the car because he was informed that the officer suspected that he possessed narcotics); *People v. Phillips*, 264 Ill. App. 3d 213, 222 (1994) (defendant's consent to search of his motorcycle included search of a jacket located in the rear cargo area when the express object of the search was narcotics); *United States v. Rich*, 992 F.2d 502, 506–07 (5th Cir. 1993) (defendant's consent to the officer's request to look in his truck included suitcase located behind the passenger seat because the officer had just asked the defendant if he had any narcotics in the truck). However, a defendant's general consent to search a vehicle does not necessarily authorize an officer to break into locked containers or otherwise do physical damage to the vehicle in carrying out the search. See, *e.g.*, *Jimeno*, 500 U.S. at 251-52 ("It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk ***."); *Vasquez*, 388 Ill. App. 3d at 553 (removal of the vehicle's bumper exceeded the scope of the defendant's consent to search vehicle); see also *State v. Wells*, 539 So. 2d 464, 467 (Fla. 1989).

¶ 29     Neither this court nor our supreme court has addressed whether a defendant's consent to search his vehicle and its contents for contraband extends to the spaces behind interior door panels that are not visible to the naked eye from inside the vehicle's passenger cabin. Other courts that have addressed this issue are split. The majority of courts hold that a defendant's consent to search a vehicle includes any place within the vehicle that might reasonably contain the expressed objects of the search, including the spaces behind door panels.[5] Under this rule, once an officer obtains a defendant's consent to search a vehicle for contraband, the officer may pry open or remove the vehicle's interior door panels to search for the contraband–without probable cause and without obtaining additional consent–provided that the space behind the door panels may reasonably contain the contraband at issue. See, *e.g.*, *State v. Powell*, 683 A.2d 1175, 1177 (N.J. Super. Ct. App. Div. 1996); *People v. Crenshaw*, 12 Cal. Rptr. 2d 172, 179 (Cal. Ct. App. 1992). However, a minority of courts have held that a general consent to search a vehicle for contraband does not include consent to search behind interior door panels or in other areas that are not customarily opened or easily accessed. See, *e.g.*, *State v. Swanson*, 838 P.2d 1340, 1345 (Ariz. Ct. App. 1992); *United*

---

[5]See, *e.g.*, *United States v. Mayo*, 627 F.3d 709, 715 (8th Cir. 2010); *State v. Garrett*, 177 S.W.3d 652, 658 (Tex. App. 2005); *United States v. Zapata*, 180 F.3d 1237, 1243 (11th Cir. 1999); *State v. Powell*, 683 A.2d 1175, 1177 (N.J. Super. Ct. App. Div. 1996); *People v. Crenshaw*, 12 Cal. Rptr. 2d 172, 179 (Cal. Ct. App. 1992); *United States v. Pena*, 920 F.2d 1509, 1514-15 (10th Cir. 1990).

*States v. Garcia*, 897 F.2d 1413, 1419-20 (7th Cir. 1990); see also *State v. Arroyo-Sotelo*, 884 P.2d 901, 905 (Or. Ct. App. 1994) (applying Oregon law but construing fourth amendment standards).

¶ 30     Under the facts presented here, we hold that Thulen's search was within the scope of the consent given by the defendant. Thulen asked the defendant if Thulen could search the "vehicle and its contents" for "contraband." The defendant answered "yes." It would be reasonable to find contraband hidden behind a removable door panel. Thus, a reasonable person in the defendant's position would have understood that he had authorized Thulen to search behind the vehicle's door panels, particularly where (as here) the panels could be easily removed and replaced and the search could be accomplished without causing any structural damage to the car. Officer Thulen did not alter or damage the vehicle or remove anything that could not be easily replaced (as in *Vasquez*). Rather, he merely used a screwdriver to pry open a door panel–a panel which he testified was already slightly ajar–so that he could peer into the space behind it. Given the minimally invasive manner in which this search was conducted and the unlimited consent given by the defendant, we hold that Thulen's search did not exceed the scope of consent.

¶ 31     Although we do not decide the issue, we note that Thulen's search behind the vehicle's rear passenger door panel might also have been supported by probable cause. When a police officer is lawfully inside a vehicle, he may develop probable cause to search any part of the automobile "based on his observations therein." *People v. Schrems*, 224 Ill. App. 3d 988, 996-97 (1992); *United States v. Casares-Cardenas*, 14 F.3d 1283, 1286 (8th Cir. 1994) (the "warrantless search of an automobile, predicated on consent, may be expanded beyond the scope of the consent when it yields a basis for a reasonable articulable suspicion that *** contraband may be found in parts of the car not included in the consent"); see also *United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000); *State v. Moore*, 154 P.3d 1, 14-15 (Kan. 2007). While searching the vehicle, Thulen and Trooper Steen found two walkie-talkie radios and a plane ticket with the name McHugh on it, and Thulen noticed that the plastic part of the rear passenger door was pulled slightly away from the metal framework of the door. Moreover, before Thulen began searching the vehicle, he observed other facts which arguably suggested that the defendant might be a drug courier.[6] Thulen testified that, based upon his training, education, and experience, the contents of the vehicle and the observations that Thulen had made from the beginning of the traffic stop "led [him] to believe that criminal activity was afoot."

¶ 32     Thus, it is possible that Thulen had probable cause to search behind the rear passenger door panel, even if that search exceeded the scope of the consent given by the defendant. See, *e.g.*, *United States v. Banuelos-Romero*, 597 F.3d 763, 767-69 (5th Cir. 2010) (finding probable cause for warrantless search of car where, *inter alia*, defendant fit drug courier

---

[6]For example, the defendant had an FBI number and was driving a vehicle rented in Nevada even though he had a California driver's license. Moreover, although the defendant claimed that he was moving from Las Vegas to Buffalo, New York, Thulen testified that there were items in the vehicle that Thulen believed were not the type of items that people who are moving typically carry in their vehicles.

profile and it was evident that windshield in vehicle had been recently replaced); *United States v. Ledesma*, 447 F.3d 1307, 1315-19 (10th Cir. 2006) (evidence of hidden compartment in back of van, together with small amount of luggage inconsistent with stated travel plans, denial of relationship with other vehicle traveling close together with van, and extreme nervousness, added up to probable cause). If so, it would be preferable to decide this case on that basis. However, because the State has not raised this issue on appeal, we decline to reverse the trial court's ruling on this basis. See *People v. Givens*, 237 Ill. 2d 311, 323 (2010) (ruling that "a reviewing court should not normally search the record for unargued and unbriefed reasons to reverse a trial court judgment" (emphasis omitted) (internal quotation marks omitted) and that judgments should be reversed on such grounds only in the rare instance where the error is "obvious" and "controlled by clear precedent"); see also *Taliani v. Herrmann*, 2011 IL App (3d) 090138, ¶ 24.

¶ 33                                                    CONCLUSION

¶ 34        For the foregoing reasons, we reverse the trial court's order suppressing evidence and remand the matter to the trial court for further proceedings.

¶ 35        Suppression order reversed; cause remanded.

¶ 36        PRESIDING JUSTICE SCHMIDT, specially concurring:

¶ 37        I concur, but write separately to point out that I find the length of the traffic stop irrelevant. Defendant consented to the search after the conclusion of the traffic stop. There is nothing in this record that would lead one to believe that the length of the traffic stop had any bearing on the decision of defendant to give consent to search after the traffic stop was concluded. While there may be cases where the length of a stop might have bearing on a later search, such as when police unreasonably detain someone while waiting for a drug-sniffing dog, we are presented with no such facts here. Also, as in *People v. Brownlee*, 186 Ill. 2d 501 (1999), police conduct *after* the conclusion of a traffic stop may lead reasonable people to conclude that they are not free to go and, therefore, a second seizure occurs which vitiates any notion of voluntary consent. The key to *Brownlee* is the court's finding that a second seizure occurred *after* the conclusion of the initial traffic stop. I can conjure no rational relationship between the length of this traffic stop and defendant's consent to search given after its conclusion.