2025 IL App (2d) 240477
No. 2-24-0477
Opinion filed December 30, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-71 |
| ANDRE WHITE, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1                                    I. INTRODUCTION

¶ 2     Following a bench trial in the circuit court of Kane County, defendant, Andre White, was convicted of unlawful possession of a controlled substance containing heroin and fentanyl with the intent to deliver, unlawful possession of heroin with the intent to deliver, and unlawful possession of cocaine with the intent to deliver. He was sentenced to 20 years' imprisonment. He now appeals, arguing that the trial court erred in denying his motion to suppress the controlled substances at issue in this case. For the reasons that follow, we affirm.

¶ 3                                    II. BACKGROUND

¶ 4      A police officer conducted a traffic stop of the vehicle defendant was operating. The officer asked defendant if he could "search" the vehicle, and defendant agreed. During the search, the officer used a small tool to remove a panel from the back of the center console. There, the officer found 26.3 grams of cocaine and 103.2 grams of a substance containing heroin and fentanyl. Defendant filed a motion to suppress, asserting that the search was illegal. A hearing was held on defendant's motion.

¶ 5      At the hearing, the only witness to testify was Detective Luke Weston of the Kane County Sheriff's Department. Weston stated that he had been a police officer for over four years and had received training regarding narcotics and automobile searches. On January 11, 2022, Weston was on Interstate 90. He was working without a partner. Weston observed a black Chevrolet SUV that "appeared to be speeding in the left lane on a three-lane highway." He used his radar and determined that the vehicle was going 75 miles per hour in a 70 miles per hour zone. Weston activated his lights, and defendant pulled over immediately. Defendant was alone. Weston told defendant that he had stopped him for speeding and a left-lane violation. At Weston's request, defendant produced his driver's license, proof of insurance, and a rental agreement for the vehicle. Weston directed defendant to step out of the vehicle. He noted the odor of cannabis. Weston added that "[u]pon approaching the vehicle, [he] smelled an unburned odor of cannabis in the vehicle." Defendant was cooperative.

¶ 6      Weston asked defendant to sit in the front seat of his squad car. While in the front seat, Weston asked defendant about where he lived, his criminal history, and his destination. Defendant "cooperatively answered [his] questions." Weston asked if there was anything illegal in the vehicle and whether there was any cannabis in the vehicle. Defendant stated that there was not but admitted

smoking some in the vehicle earlier. Weston asked whether the vehicle contained cocaine, heroin, methamphetamine, or guns. Defendant replied that it did not. Weston testified that he "asked [defendant] if [he could] search his vehicle to make sure there's nothing illegal in the vehicle and [defendant] responded, yeah, [Weston could] search." Weston did not tell defendant that he would be using a tool during the search.

¶ 7    Before beginning the search, Weston went to the passenger side of his squad car to make sure defendant did not possess a weapon. He asked defendant if he had cannabis on him, as "it smelled like he had marijuana on his person." Defendant answered, "No."

¶ 8    Weston searched the front passenger compartment of defendant's vehicle. He checked whether any panels were loose on the front console using a "plastic upholstery tool." He denied the tool was a "small hand-held crowbar" (at trial, Weston testified that it was "a blue Desert Snow plastic upholstery tool designed to remove panels in vehicles safely and without causing damage."). Weston located a brown handbag. Inside, he found "a package that contained pills that looked like, based on [his] training and experience, ecstasy tied into a plastic bag." He returned to the squad car and placed defendant in handcuffs "based on the suspicion that it might be a controlled substance." Defendant stated that the pills were legal (at trial, Weston testified that defendant told him the pills were Viagra.). Defendant was moved to the back of the squad car. He examined the pills "after the arrest."

¶ 9    Weston returned to defendant's vehicle. He located some currency in a backpack and removed a panel where the airbag and glove compartment meet. Defense counsel asked, "And you used your upholstery tool to break that off of the side?" Weston replied, "Not to break it, to pry it off, yes." Defense counsel then queried, "Well, the plastic tabs broke when you removed it,

correct?" Weston answered, "I'm not sure they broke. I believe they came open." Weston was unable to access the glove compartment.

¶ 10    He then searched the rear of the passenger compartment. Weston sat in the rear passenger-side seat. He noted that "the rear climate control of the back of the center console where the air conditioning comes out was pried at the bottom and appeared to be loose." He used the upholstery tool to remove the panel, where he observed a "vacuum-sealed bag that contained what looked like a white powdery substance."

¶ 11    On cross-examination by the State, Weston explained that the left-lane violation he observed defendant commit was that there were vehicles behind defendant but none in the middle lane, so defendant could have moved over so as not to impede traffic. When he initially approached defendant's vehicle, he spoke with defendant through the passenger-side window. At that time, he could detect an odor of raw, unburnt cannabis. When defendant initially sat in the squad car, the doors were not locked. Weston believed that defendant was acting suspiciously while Weston questioned him in the squad car. He explained that he asked defendant where he was going, and defendant stated to visit a cousin in Minnesota. Defendant hesitated when Weston asked him the name of his cousin "and almost let out a nervous laughter, stalling kind of, based on my training and experience, to think of a name to tell me."

¶ 12    Weston testified that he used the upholstery tool to see if there were any loose panels in the car. He did not "damage any part of the car." The white powdery substance was recovered from a place where, in Weston's training and experience, drugs could be stored. Weston explained that he did not immediately search the vehicle when he first smelled raw cannabis because he was alone on the interstate. He wanted to see if defendant had any warrants and to gauge defendant's level of cooperation. He also wanted to see where his backup was before starting the search, as he

did not want defendant to flee or attack him while he was conducting the search. On redirect examination, Weston explained that he was standing near where the front and back windows meet between the doors when he smelled raw cannabis.

¶ 13    Following Weston's testimony, the case was continued. Before the parties reconvened for argument, the trial judge, by agreement of the parties, viewed a video recording taken by a dash camera on Weston's squad car. The defense rested, and the State moved for a directed finding.

¶ 14    The trial court granted the State's motion. It first noted that, "[a]s thin as it is, going 75 in a 70 is speeding," so probable cause existed to stop defendant's vehicle. Weston smelled raw cannabis. The trial court acknowledged that none was recovered from the vehicle, but observed, "The fact that it was a rental car and that [the] odor of raw cannabis could have got there some other way other than the defendant does not negate the fact that it gave probable cause to search the vehicle." The trial court further found that defendant did not manifest any suspicious behavior when speaking with Weston in the squad car. It further emphasized that defendant had given consent to *search*:

> "The case that I see that's different that has been cited by the defense with the U-Haul truck, 'mind if I take a look' in response to 'my belongings are back there [in the back of the truck]', 'no, go ahead.' That, to me, limits the consent to basically taking a look.
>
> In this case we have, 'do you have any drugs in the car.' 'No.' 'Mind if I search.' 'No, go ahead.' That to me is consent to search for drugs in response to the answer that Mr. White gave. And so [Weston] searched in places where he, in his experience, had found drugs before." (Internal quotation marks added.)

¶ 15    The trial court then noted defense counsel's assertion that Weston was "breaking the car" during the search. The trial court, having viewed the dash camera recording, surmised that defense

counsel was referring to the "side panel on the dashboard," which Weston pried off. The trial court stated, "A piece pops off on the side and falls into the roadway." The trial court added, "I don't know if it broke or not."

¶ 16    The trial court then found that when Weston observed the back of the console, he saw that it was misaligned, "which looked unusual." Weston removed the panel and found the drugs. The trial court found that this did not exceed the scope of the consent granted by defendant. However, it added, "And while I don't, quite honestly, like the actions of the officer in this case, I think he was within his rights and didn't act in any way illegally." It then granted the State's motion for a directed finding.

¶ 17    The case proceeded to a bench trial. The State first called Sydney Bailey, who manages the Enterprise Rent-A-Car in Blue Island. On January 10, 2022, she rented a black Chevrolet SUV to defendant. She could not make an in-court identification of defendant. Defendant had previously rented vehicles from Bailey. Defendant requested a particular vehicle, and Bailey requested that one be prepared for defendant, which involved cleaning it. Bailey observed the vehicle being cleaned. She obtained defendant's name from his driver's license. Bailey and defendant inspected the vehicle. She did not note any personal belongings in it during their inspection. She noted no damage or other issues regarding the rear passenger seat area, including the center console. The console was not "misaligned in any way." Defendant did not point out any damage.

¶ 18    During the week following the rental, defendant came into the Enterprise branch to retrieve personal items he left in the car. Within the following week, defendant returned to the branch and spoke with Bailey. Defendant asked about any conversation Bailey had had with the police. Bailey told him that she had provided her statement to her superiors. She then terminated the conversation with defendant. Defendant returned at least two more times. Defendant "asked again about the

conversation [she] had with the officer and asked if [she] could communicate that he took the vehicle dirty." Defendant came back on another occasion, again asking Bailey about what she told the police.

¶ 19    On cross-examination, Bailey testified that she was one of seven employees that deal with customers in the Enterprise branch she worked at. The branch has a fleet of about 350 cars. They rent 40 cars per day or 800 per month. All are cleaned prior to being rented out. She acknowledged that she had rented hundreds of cars since she rented the black SUV to defendant. She did not know who cleaned this vehicle prior to defendant taking it. Bailey was contacted by a Kane County Sheriff's deputy on January 12, 2022. She told him that they typically do not remove panels from the interior of a vehicle to clean it. Bailey had nothing to document defendant renting a vehicle from them on previous occasions. On redirect examination, she stated that an employee would, while cleaning a car, inspect a panel that was detached.

¶ 20    The State next called Weston. His testimony was substantially similar to his testimony during the suppression hearing. Weston recovered a "vacuum-sealed bag containing what appeared to be narcotics" when he searched defendant's vehicle. When he got back to the sheriff's office, Weston discovered that the vacuum-sealed bag had another bag inside of it, which contained two additional bags. The parties stipulated that the contents of the bags were tested by the Illinois State Police Forensic Science Laboratory and were determined to contain 26.3 grams of cocaine and 103.2 grams of a substance containing heroin and fentanyl. During the course of the search and arrest, Weston discovered three cellular telephones. He also found two bundles of currency in a backpack in the amount of approximately $2,970. Defendant was transported to the sheriff's office. Weston asked defendant if he had any cannabis on him before he went to jail. Defendant removed

a package of what appeared to be cannabis from the groin area of his pants. During questioning, defendant stated that no one else had used the vehicle since he rented it.

¶ 21　On cross-examination, Weston acknowledged that he was part of the "special investigations unit." He agreed that their job was to "locate narcotics" and "not to look for traffic violators." After he stopped defendant, defendant was generally cooperative. Weston could smell cannabis on defendant when they were seated in the squad car (Weston added that he also smelled it when he approached defendant's vehicle). Weston searched the entire vehicle and discovered no other contraband. On redirect examination, Weston stated that despite defendant telling him that he did not have any weapons on him, Weston later recovered a knife from the pocket of the pants defendant was wearing.

¶ 22　The State's final witness was Sergeant Ryan Monaghan of the Kane County Sheriff's Office. Over defendant's objection, the trial court recognized Monaghan as an expert in the area of drugs, drug delivery, and drug sales. Monaghan opined that, based on the totality of the circumstances, defendant possessed both the cocaine and the substance containing heroin and fentanyl with the intent to deliver.

¶ 23　The trial court found defendant guilty of all counts. During the course of rendering its decision, the trial court stated, "I will also say I do not agree with the conduct of the detective when he started taking the car apart." Defendant subsequently filed a posttrial motion asking the trial court to reconsider its ruling on his motion to suppress.

¶ 24　In his posttrial motion, defendant challenged, in pertinent part, the trial court's denial of his motion to suppress. He argued that the search conducted by Weston "far exceeded the scope of the consent or any probable cause." Following the parties' arguments, the trial court stated that it was "still troubled" by the motion to suppress, and it took the issue under advisement. When the

parties reconvened, the trial court denied defendant's motion. The trial court began its ruling by emphasizing that "the language that was used" by Weston in requesting consent to search was "critical more so than anything else." The "upholstery tool" used by Weston was "actually a nylon pry bar." The trial court found that Weston's "testimony that there was a gap in the base, rear base in the back seat part of the center console and that's why he chose to look in that area" lacked credibility. The trial court then stated that if defendant had assented when asked if Weston could "take a look" in his car, the trial court "would grant the motion in a second." However, defendant was asked if Weston could "search [his] car." The trial court then explained: "That is without any restriction. It's more than just look around the car. It's a search. Common knowledge tells you, you can tell someone they can search something and they can search, they can look where they want to look." The trial court then denied defendant's posttrial motion. Defendant now appeals.

¶ 25                                    III. ANALYSIS

¶ 26     On appeal, defendant raises a single, overarching issue: whether Weston's search of his vehicle was constitutionally unreasonable. He argues that Weston's use of a "pry bar" to remove the rear of the center console was beyond the consent he granted to search his vehicle. He also argues that Weston lacked probable cause to search the vehicle, that the search conducted by Weston was unreasonable in that it was "invasively executed," and that the search could not be justified as being a search incident to arrest. As we find the search at issue to be within the scope of defendant's consent, we need not address defendant's other arguments.

¶ 27     In reviewing a trial court's ruling on a motion to suppress, we apply a mixed standard of review. *People v. Lee*, 214 Ill. 2d 476, 483 (2005). A trial court's findings of historical fact are entitled to deference; hence, those findings will be upheld unless they are contrary to the manifest weight of the evidence. *Id.* We review *de novo* the ultimate issue of whether suppression of the

evidence is required. *Id.* at 484. On review, we may consider the entire record, including trial testimony. *People v. Stewart*, 104 Ill. 2d 463, 480 (1984).

¶ 28   When a defendant moves to suppress evidence, he or she "bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22. The "defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure." *Id.* This "means that the defendant has the primary responsibility for establishing the factual and legal bases for the motion to suppress." *Id.* A defendant meets this burden by showing that a warrantless search was conducted. *People v. Kowalski*, 2011 IL App (2d) 100237, ¶ 9. If the defendant is successful, "the burden shifts to the State to go forward with evidence [to counter] the defendant's *prima facie* case." *Id.* The ultimate burden of proof on the motion remains with the defendant. *Id.* Hence, in this case, since Weston had no warrant, defendant established a *prima facie* case and the burden of production shifted to the State, while the burden of persuasion remained with defendant.

¶ 29   "Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures." *People v. Carter*, 2021 IL 125954, ¶ 22; U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A warrantless search is generally considered unreasonable unless it falls within one of several well-established exceptions. *People v. Eubanks*, 2024 IL App (1st) 221229, ¶ 13. One such rule is known as the automobile exception, which permits a warrantless search of a vehicle so long as probable cause for a search exists. *Id.* Another is where a defendant consents to a search. *People v. Dawn*, 2013 IL App (2d) 120025, ¶ 30. The issue of consent is dispositive here.

¶ 30   Defendant does not dispute the fact that he validly consented when Weston requested permission to search his vehicle. "It is well settled that an individual may consent to a search conducted without a warrant, thereby eliminating the need for probable cause and a search

warrant" *People v. Ledesma*, 206 Ill. 2d 571, 592 (2003), *overruled on other grounds*, *People v. Pitman*, 211 Ill. 2d 502, 513 (2004). Rather, defendant argues that Weston's search exceeded the scope of his consent.

¶ 31    Generally, "[t]he standard for measuring the scope of a suspect's consent is that of ' "objective" reasonableness,' which requires consideration of what a 'typical reasonable person [would] have understood by the exchange between the officer and the suspect.' " *Ledesma*, 206 Ill. 2d at 593 (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). The scope of consent is ordinarily defined by the express object or purpose of the search to which a defendant has consented. *Id.* "By stating the intended object of the search either directly or by revealing a suspicion of specific criminal activity, a police officer not only apprises the suspect that his constitutional rights are being impacted, but he also informs the suspect of the reasonable parameters of his inquiry." *People v. Baltazar*, 295 Ill. App. 3d 146, 150 (1998). Thus, "courts have determined that an officer may search smaller containers found inside the larger area being searched if it would be objectively reasonable to find the stated object of the search in that smaller container." *Id.* However, "a defendant's general consent to search a vehicle does not necessarily authorize an officer to break into locked containers or otherwise do physical damage to the vehicle in carrying out the search." *People v. Kats*, 2012 IL App (3d) 100683, ¶ 28.

¶ 32    Here, Weston first asked defendant whether there was anything illegal in the vehicle, such as cannabis. Defendant answered negatively. Weston then inquired whether there was cocaine, heroin, methamphetamine, or guns in the vehicle. Defendant replied that there was not. Weston then "asked [defendant] if [he could] search his vehicle to make sure there's nothing illegal in the vehicle and [defendant] responded, yeah, [Weston could] search." Hence, defendant consented to a search of his vehicle for drugs or guns, and defendant's consent would include areas where drugs

could possibly be found. See *Baltazar*, 295 Ill. App. 3d at 150. The compartment behind the panel on the rear of the console constitutes such an area.

¶ 33     Sound guidance can be found in *Kats*, 2012 IL App (3d) 100683, where a police officer discovered cannabis behind the panel of the rear passenger-side door during a search of the defendant's vehicle. *Id.* ¶ 10. The officer used a screwdriver and an upholstery tool to pry open the door panel. *Id.* The defendant had assented when the officer asked if he could search the defendant's "vehicle and its contents" for "contraband." *Id.* ¶ 7. The *Kats* court held that the search was within the scope of the defendant's consent, explaining:

> "Under the facts presented here, we hold that [the officer's] search was within the scope of the consent given by the defendant. [The officer] asked the defendant if [he] could search the 'vehicle and its contents' for 'contraband.' The defendant answered 'yes.' It would be reasonable to find contraband hidden behind a removable door panel. Thus, a reasonable person in the defendant's position would have understood that he had authorized [the officer] to search behind the vehicle's door panels, particularly where (as here) the panels could be easily removed and replaced and the search could be accomplished without causing any structural damage to the car. [The officer] did not alter or damage the vehicle or remove anything that could not be easily replaced (as in [*People v.*] *Vasquez*[, 388 Ill. App. 3d 532 (2009)]). Rather, he merely used a screwdriver to pry open a door panel—a panel which he testified was already slightly ajar—so that he could peer into the space behind it. Given the minimally invasive manner in which this search was conducted and the unlimited consent given by the defendant, we hold that [the officer's] search did not exceed the scope of consent." *Id.* ¶ 30.

Given the profound similarities between *Kats* and the instant case, we deem it controlling here.

¶ 34　Defendant endeavors to distinguish *Kats* by claiming, "Here, Officer Weston ripped off panels and damaged the car unlike the factual setting in *Kats*." Defendant offers no citation to the record to substantiate this proposition, which is perhaps unsurprising, for, as we explain below (*infra* ¶ 37), the trial court expressly declined to find that Weston damaged defendant's vehicle and the evidence of record indicated otherwise. In short, defendant's attempt to distinguish *Kats* is ill-founded.

¶ 35　Defendant calls our attention to *People v. Davis*, 2019 IL App (1st) 160408, *abrogated on other grounds*, *People v. Smart*, 2025 IL 130127, where the First District held that a search exceeded the scope of consent on grounds similar to this case and *Kats*. In that case, a police officer asked the defendant if there were any drugs in the vehicle the defendant was operating. *Davis*, 2019 IL App (1st) 160408, ¶ 11. The defendant replied, " 'There's no drugs in the car, go ahead and search it ***.' " *Id.* The First District found that this grant of consent did not authorize the officer to search a secret compartment in the back of the passenger compartment. *Id.* ¶ 36. The *Davis* court stated that the officer "had no objective information leading him to reasonably believe *** that he had given permission to remove interior panels." *Id.* ¶ 34.

¶ 36　We disagree. It is well established that consent to search for drugs entails consent to search where drugs may be found. See *Jimeno*, 500 U.S. at 251; *Baltazar*, 295 Ill. App. 3d at 150 ("By stating the intended object of the search *** a police officer *** informs the suspect of the reasonable parameters of his inquiry."). Contraband is not typically left out in the open. See *People v. Phillips*, 264 Ill. App. 3d 213, 224 (1994) ("[I]t can be expected that a reasonable person knows that illegal drugs are usually carried in some kind of container or package *hidden from view ***.*" (Emphasis added.)); *People v. Varnauskas*, 2018 IL App (3d) 150654, ¶ 35 ("Based on probable cause, the officers conducted a roadside search of readily accessible areas in the vehicle and areas

of the vehicle where drugs are typically hidden by drug traffickers."). By consenting to a search after the officer inquired about illegal drugs, a reasonable person in the position of the defendant in *Davis* surely would have realized that the search in question would encompass hiding places that could hold drugs.

¶ 37    Defendant contends, nevertheless, that his consent notwithstanding, Weston exceeded the bounds of a reasonable search when he "broke" parts of the vehicle. He argues, "What made this search unreasonable was the officer's breaking apart and damaging parts of the rented vehicle to search closed compartments within that vehicle." Defendant's assertion lacks support in the record. While ruling on defendant's motion to suppress, the trial court addressed defendant's claim that Weston damaged the vehicle:

> "And I think when [defense] counsel is referring to breaking the car, it's the side panel on the dashboard that [Weston] pries off. He actually pries off with his nylon pry bar. He calls it an upholstery tool but that's not what it is. It's a nylon pry bar. A piece pops off on the side and falls into the roadway. *I don't know if it broke or not*. I think that's what's being referred to." (Emphasis added.)

Thus, when considering defendant's assertion that Weston had broken the vehicle, the trial court expressly declined to make a finding, stating, "I don't know if it broke or not." Moreover, we note Weston's unrebutted testimony that he did not damage any part of the vehicle. Defendant asserts that a video recording of the search shows Weston "breaking the car apart with force and in the process causing damage to the vehicle." We have reviewed that video and find defendant's characterization of Weston's actions inaccurate. It is true that one panel fell out of the vehicle and landed on the ground after Weston removed it; there is no indication that it sustained any damage

in the process. Thus, while Weston may have disassembled portions of the vehicle, nothing in the record suggests that anything was damaged.

¶ 38 Indeed, the disassembly of a vehicle does not render a search unreasonable. In *People v. Roa*, 398 Ill. App. 3d 158, 160 (2010), a police officer asked the defendant if there were any drugs, weapons, or alcohol in his vehicle. The defendant answered "No," and he granted consent to search. *Id.* During the course of the search, a hidden compartment was discovered using a fiberoptic device, and, "when the compartment was disassembled, the [police] found the compartment contained a total of 24.2 pounds of cocaine." *Id.* at 161. The reviewing court sustained the trial court's finding that the search was within the scope of the defendant's consent, as related by the officer. *Id.* at 165-66. *Roa* provides further support for finding Weston's search within the scope of defendant's consent.

¶ 39 Arguing for a contrary result, defendant cites *People v. Vasquez*, 388 Ill. App. 3d 532 (2009); however, that case is distinguishable. In *Vasquez*, the police, in the course of a search purportedly authorized by the defendant's consent, removed the bumper of the defendant's car and discovered a large quantity of cash. *Id.* at 541. The defendant was subsequently indicted for, *inter alia*, money laundering. *Id.* at 534. The trial court suppressed the evidence, finding that the defendant's consent was not valid and, even if it was, removing the bumper of the car was outside the scope of that consent. *Id.* at 553-54.

¶ 40 However, certain facts render *Vasquez* inapposite here. Notably, in that case, there is no indication that the police informed the defendant of the object of their search. The *Vasquez* court stated, "It would be easier to decide the scope issue in this case if the officers had specified on the consent form the place in the car they intended to search and the person or things to be seized." *Id.* at 553 n.3. Conversely, in this case, Weston indicated, through his questioning of defendant, that

he intended to search the vehicle for guns and drugs. By communicating this to defendant, Weston "inform[ed defendant] of the reasonable parameters of his inquiry." *Baltazar*, 295 Ill. App. 3d at 150. Thus, unlike the defendant in *Vasquez*, in this case, defendant was aware he was consenting to a search that could encompass hidden compartments in his vehicle. Moreover, the *Kats* court stated that the search of a hidden compartment in a vehicle was reasonable, "particularly where *** the panels could be easily removed and replaced and the search could be accomplished without causing any structural damage to the car." *Kats*, 2012 IL App (3d) 100683, ¶ 30. Based on Weston's testimony, it is apparent that the removal of the panel on the back of the center console was akin to the search contemplated in *Kats*. It is far from clear from our reading of *Vasquez* that the same could be said of removing a bumper. Defendant's reliance on *Vasquez* is ill-placed.

¶ 41 Before closing, we note that defendant repeatedly points out that the trial judge stated that he did not "like the actions of the officer in this case." He further stated, "I will also say I do not agree with the conduct of the detective when he started taking the car apart." Such statements aside, the trial court also stated that the officer "was within his rights and didn't act in any way illegally." Accordingly, we place little weight on such statements. *Cf. In re Kendale H.*, 2013 IL App (1st) 130421, ¶ 31 (" '[I]t is a fundamental principle of appellate law that when an appeal is taken from a lower court judgment, the question before the court of review is the correctness of the result, not the correctness of the reasoning on which the result was reached.' " (quoting *People v. Johnson*, 208 Ill. 2d 118, 128 (2003))).

¶ 42 In sum, we hold that Weston's search of defendant's vehicle did not exceed the scope of defendant's consent.

¶ 43 IV. CONCLUSION

¶ 44 In light of the foregoing, we affirm the judgment of the circuit court of Kane County.

¶ 45    Affirmed.

*People v. White*, **2025 IL App (2d) 240477**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 22-CF-71; the Hon. David P. Kliment, Judge, presiding. |
| **Attorneys for Appellant:** | James K. Leven, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |